361 F.2d 393
 Charles David MALEY, Trustee in bankruptcy of National Lumber Company, a division of C. M. Paul Lumber Co., Bankrupt, Plaintiff-Appellee,
v.
EAST SIDE BANK OF CHICAGO, an Illinois corporation, Defendant-Appellant.
 No. 15072.
 United States Court of Appeals Seventh Circuit.
 June 1, 1966.
 Rehearing Denied June 21, 1966.
 
 1
 COPYRIGHT MATERIAL OMITTED Robert A. Sprecher, Ray Berg, Nathan Wolfberg, Chicago, Ill., for defendant-appellant.
 
 
 2
 John D. Schwartz, George W. Overton, Chicago, Ill., for plaintiff-appellee, Overton, Marks & Schwartz, Chicago, Ill., of counsel.
 
 
 3
 Before DUFFY and SWYGERT, Circuit Judges, and GRANT, District Judge.
 
 
 4
 GRANT, District Judge.
 
 
 5
 This is an action by a trustee in bankruptcy for a corporation to recover from a bank the amounts of checks payable to the corporation but cashed or deposited by the president and sole shareholder of the corporation for his own benefit. The district court entered a summary judgment for the trustee against the bank in the sum of $46,127.18 plus interest and costs.[1] We are of the opinion that the decision of the district court should be affirmed, the reasons for which are hereinafter set forth following a statement of the facts.
 
 
 6
 After several months of existence as a sole proprietorship, the C. M. Paul Lumber Company was incorporated as an Illinois corporation on January 25, 1961. Norman M. Paul, the owner of forty per cent of the outstanding capital stock, was elected president and treasurer and one of the three directors. Leon Rosen and George Rubenstein owned the remaining sixty per cent of the stock and were the other two directors. From its inception, the C. M. Paul Lumber Company used the trade name "National Lumber Company" and the corporation was generally known and referred to in the trade as such.[2]
 
 
 7
 The board of directors of National Lumber at its first meeting on January 25, 1961, passed a resolution in the printed form required and supplied by the East Side Bank of Chicago, naming said bank as depositary. The resolution authorized "the officers or employees of said Corporation * * * to endorse, in the name of this Corporation for the purpose of deposit and collection in and with said Bank, checks, drafts, notes and other like obligations, issued or drawn to and owned by said Corporation * * *." The president, Norman M. Paul, was given the sole power and authority to sign checks upon corporate deposits and the bank was authorized to pay out corporate funds on deposit with it "whether said checks are payable to cash, bearer or the order of the Corporation, or to any third party, or to the order of any signing or counter-signing officer of the Corporation or any other Corporation officer, in either their individual or official capacity." The corporate minutes also show that, by resolution of the directors on January 25, 1961, the president of the corporation was authorized to sign checks withdrawing funds from the corporate account and the defendant bank was authorized and directed to "honor, pay and charge to the account of this corporation all checks and orders for the payment of money so drawn when so signed, without inquiry as to the circumstances of their issue or the disposition of their proceeds, whether such checks be payable to the order of or endorsed by any officer or person signing them or whether they are deposited to the individual credit of any officer or person signing them." While the resolution on file with the bank was later rescinded and another filed in its stead, the latter resolution was never revoked nor stricken by the directors from the corporate minutes.
 
 
 8
 By December, 1962, George Rubenstein had resigned as a director of National Lumber. Rubenstein had been replaced as a director by Frieda Rosen, the wife of Leon Rosen, and Frieda thereupon had been elected vice president of the corporation and Leon Rosen, secretary. By that time, also, the corporation was indebted to Paul and Leon Rosen in the sum of $31,500.00, evidenced by three promissory notes.
 
 
 9
 During the fall of that year, Paul had mentioned to several people that he was interested in obtaining another participant in the corporation who would be active in operating the lumber business so that Paul could devote more time to outside selling. In early December, Mort Schulman contacted Norman M. Paul and told Paul he was interested in getting into the lumber business, having had previous experience in remodeling situations and selling various allied items. Schulman's purported interest in becoming Paul's business associate received little encouragement from Paul, who was not only unimpressed with Schulman's qualifications but was perplexed by his apparent reluctance to contact him other than by telephone. In all likelihood the relationship between the two would not have progressed further had not Schulman, within the short period of a few days, countered with a proposal to purchase National Lumber entirely, stating that "he was interested in some project that he wanted to use the yard as a buying instrument for" in that "he was buying merchandise and had to have some place to put it."
 
 
 10
 Thereafter, on December 13, 1962, following upon a series of unusual if not eminently suspicious events,[3] a contract was executed by Norman M. Paul and Leon Rosen, described in the contract as the owners of all outstanding capital stock of C. M. Paul Lumber Company, Inc., and by Mort Schulman, whereby Schulman agreed to buy all of the stock and the three promissory notes for $22,000.00. The purchase price was payable $5,000.00 upon execution of the contract and by the delivery of two notes for the balance, which notes were payable to Paul and Rosen in thirty days. Pursuant to the contract, on that date the officers and directors of the corporation resigned and Mort Schulman was elected president. However, to secure payment of the $17,000.00 Schulman notes held by Paul and Rosen, it was further agreed that until such consideration was paid Paul would act as treasurer and Rosen as secretary of the corporation.
 
 
 11
 On December 17, 1962, Leon Rosen, as secretary of National Lumber, executed a resolution on the printed form used by the defendant bank, certifying that on December 13, 1962, the board of directors had resolved that the president, Mort Schulman, and the treasurer, Norman M. Paul, were authorized to deal jointly with the defendant on behalf of the corporation. This resolution was identical to the original resolution filed with the bank in January of 1961, with the exception that the president's authority to draw upon corporate deposits was limited by the requirement that corporate checks be counter-signed by the treasurer. On or about December 17, 1962, Schulman and Paul went to the defendant bank and delivered the new resolution form, at which time the bank was also informed of the purpose for which Paul was remaining with the corporation in the capacity of treasurer.
 
 
 12
 Approximately a week after December 17, 1962, the defendant bank began being literally inundated with a flood of credit inquiries regarding National Lumber Company. Whereas the bank had been inquired of with respect to the credit standing of National Lumber on only one or two occasions during the corporation's entire previous existence, such inquiries began averaging two or three per day on or about December 24, 1962. During the ensuing four or five weeks, the bank's chief executive officer stated that he received fifty to one hundred such calls. At no time had such frequent inquiries been made concerning the credit position of other customers of the bank.
 
 
 13
 These credit inquiries were the result of the purchase, or the attempt to purchase, large quantities of steel and other goods on credit by National Lumber immediately following Schulman's election as president. Between December 13, 1962, and January 4, 1963, at least $66,757.38 of such purchases were made by National Lumber from twenty-seven different suppliers. In each such case in which credit was extended to National Lumber for such purchases it was on the basis of the corporation's respectable past credit rating and history. Upon each credit inquiry, favorable background data was furnished by the defendant East Side Bank.[4] In no instance was credit extended on the basis of Schulman's personal credit.[5]
 
 
 14
 On or shortly before January 4, 1963, Paul and Schulman again visited the East Side Bank whereupon Paul advised the defendant that Schulman had paid the entire consideration for his purchase of the stock and notes of National Lumber in accordance with the terms of the agreement of December 13, 1962. At that time, also, Schulman delivered to the defendant bank a signature card in the form supplied, on which card his signature as president of the corporation had been inserted. Said card had no other signatures. Upon receipt of the new signature card, the chief executive officer of the bank gave to Schulman a new resolution form, inasmuch as the bank then required new authorization to handle National Lumber's banking transactions in light of the change in its ownership and management. Schulman informed the bank that it might be "a little while" before he returned it to the bank, for the reason that "he did not know who was going to be on the board, and he did not know who the other officers of the corporation were going to be at that time." Schulman never returned the resolution to the bank at any time thereafter.
 
 
 15
 Then began a series of banking transactions which precipitated this lawsuit. Beginning on January 4, 1963, and extending through January 28, 1963, Schulman took $46,126.98 of certified or cashier's checks, payable to National Lumber, to defendant bank and either cashed them or had the proceeds credited to his personal account.[6] Each of the checks was received from a customer of National Lumber in payment for the building supplies purchased after December 17, 1962, and re-sold by National Lumber to such customer. With the exception of the last three checks, in each case when Schulman presented the checks to defendant East Side Bank, the bank's principal executive officer approved their cashing and the payment of the proceeds to or for the benefit of Schulman. The bank teller in the first seven cases demanded the officer's approval before cashing the checks. The teller had never before or since engaged in such a transaction as cashing of a check payable to a corporation. No part of the proceeds of any of the checks was credited to the account of National Lumber, nor did the creditors of National Lumber receive any part of the funds which Schulman obtained in the transactions.
 
 
 16
 In holding the defendant East Side Bank liable for the amounts of the checks so transacted, the district court below concluded, upon "an avalanche of evidence", that "while there was no actual knowing or intentional fraud committed by defendant or its employees, there was gross negligence." Maley v. East Side Bank of Chicago, 234 F.Supp. 395, 397 (N.D.Ill.1964). The elements of gross negligence are clearly evident in this case, and may be fairly, but briefly, listed as follows:
 
 
 17
 A. The defendant bank failed to exercise the required degree of care with respect to any of the banking transactions of National Lumber following the change in its ownership and management. The bank has argued strenuously that, in a situation where the president of a corporation is the sole owner of all the capital stock, the president and the corporation are identical for purposes here under consideration. If this be so (and we do not here pass upon the legal propriety of that proposition), then National Lumber owned by Paul and National Lumber owned by Schulman were just as different and distinct as Paul and Schulman themselves. Yet it is amply clear from the record that the East Side Bank learned and attempted to learn very little about the credit and business background of Schulman, and that it relied heavily upon the bank's experience with National Lumber under Paul. Thus, if the bank's own contention is valid, it could not have acted prudently without considering National Lumber when owned and managed by Schulman as a completely independent and unknown entity, and without treating National Lumber and particularly Schulman with that degree of caution as it would any other new customer who to the bank would be no more than a stranger off the street. In short, it was Schulman's ability to clothe himself in National Lumber's corporate veil, and the bank's gross neglect in failing to pierce it in the slightest, that was the key to his scheme to swindle the creditors.
 
 
 18
 B. The bank's reaction to the virtual torrent of credit inquiries, recounted above, is an obvious illustration of failure to exercise that degree of care demanded by the law. Not only was the great volume of such calls highly unusual in itself, but when viewed in conjunction with Schulman's statement to the bank that he needed currency in order to make cash purchases, the circumstances should have put even the most inexperienced bank officer on notice that something was awry. If Schulman was indeed purchasing in behalf of the corporation with large amounts of cash, the great number of credit inquiries could not possibly be explained unless, of course, the bank was of the impression that Schulman was purchasing with both cash and credit. But this impression would be equally implausible when the astounding volume of purchases that such an undertaking would entail would be considered together with the relative size of National Lumber, of which the bank was duty-bound to have knowledge.
 
 
 19
 C. If the conclusion that the bank's reaction — or lack of same — to the credit inquiries is evidence of gross negligence be arguable, and we do not think it is, it is not so when evaluated in light of the fact that at least one such credit inquiry was productive of explicit notice to the bank that the circumstances were considered suspect. The defendant bank's chief executive officer testified with respect to one inquiry he received prior to January 1, 1963:
 
 
 20
 "Well, after I had told him the stock answer for the credit information, he mentioned to me — or he asked me a question, and he said, `Do you have any idea why this man would be coming away up to the northwest side to buy this particular item?' He meant some item he was selling, and I don't even know what it was, but I said, `Well, I wouldn't have any idea except maybe he can get it cheaper through you.' And then he said, `No, I know that's absolutely wrong, because our price is the same as our other supplier's price, who is very close to him, down where he is.' So again I said, `Well, maybe he can't get it from them. Maybe the supply is limited.' And again he said, `No, I know that isn't the case. I know they have all kinds of them.' Then he said, `It sounds kind of fishy to me and I'm not going to sell them.'"
 
 
 21
 Upon the basis of this revealing conversation, the defendant bank made absolutely no significant effort either to protect itself or other creditors.
 
 
 22
 D. In light of the foregoing, when Schulman appeared in the bank on January 4, 1963, and presented the first of the checks herein involved, the circumstances should have been regarded as rank with suspicion. First of all, the check (like all the others) was a certified or cashier's check, which the chief executive officer admitted was "a little unusual". Secondly, Schulman made the highly unusual request to have the proceeds of the check, which (like all the others) was payable to National Lumber, transacted to his benefit. In this instance, the check was in the sum of $9,238.67, and Schulman asked that he be given $6,014.67 in cash in large denominations and that the balance of $3,224.00 be credited to his personal account. Although he was able to gain approval of the transaction from the executive officer, the head teller stated that he never had indulged in such a practice before or since. Finally, Schulman endorsed this check (unlike all the others) "For deposit only"; thus, the bank, in handling the transaction as described, did so in derogation of a restrictive indorsement. Under the circumstances, it need hardly be said that the bank cannot avoid liability for the transaction.
 
 
 23
 E. As such transactions were repeated, their suspicious nature was cumulatively enhanced. For, in the succeeding period of only eleven days, Schulman obtained another $36,788.31 in this manner, and, on January 10, 1963, alone, he walked out of the bank with a total of $12,189.45 in cash on his person. Even the bank's chief executive officer, who had had some little experience in cashing corporate checks for the benefit of corporate officers, stated that he had never so handled such checks in the amounts here involved. Yet, inexplicably, that very officer acknowledged that "it might be" accurate to say that "after the pattern was established with the first couple of checks, * * * after that no more questions were raised." Contrary to reason and intelligent banking practices, instead of increasing whatever suspicions the bank may have had, the later Schulman transactions appeared to mollify them.
 
 
 24
 F. The defendant bank's position here is not helped by the fact that it did make some little inquiry at the outset, for the reason that the action taken by the bank in response was entirely inadequate. Thus, although the bank ascertained from Schulman that cash was needed to pay suppliers, the bank officer stated that "he didn't ask him and [Schulman] didn't volunteer" why it was that some of his suppliers had to be paid in cash. The bank's neglect is also evident from the following colloquy:
 
 
 25
 "Q. (Plaintiff's counsel.) Did you ever suggest to Mr. Schulman at any time that he deposit the checks in the Lumber Company's account, and then draw checks payable to cash on the National Lumber Company account in order to secure the cash? (By which procedure Schulman would have conformed to the bank resolutions then on file.)
 
 
 26
 "A. (Bank's executive officer.) Yes, I did.
 
 
 27
 "Q. What did he say to that?
 
 
 28
 "A. He said he would rather not do that.
 
 
 29
 "Q. Was there any further discussion on that?
 
 
 30
 "A. I don't remember any, no.
 
 
 31
 "Q. Did you ask him why he would rather not do that?
 
 
 32
 "A. No, I don't think I did."
 
 
 33
 G. There are other factors which, when considered as part of the "totality of the circumstances" here evidenced, are also indicative of defendant East Side Bank's gross neglect. These would include the bank's neglect in failing to insist that the corporate resolution given Schulman prior to January 4, 1963, be returned; the bank's willingness to cash, in the manner described, the last of Schulman's checks on January 28, 1963, a week after it had been notified that Schulman was adjudicated bankrupt within the previous two years and only one day before an involuntary petition in bankruptcy was filed against National Lumber Company itself; and the bank's ingratiatory attitude toward a most suspicious customer whose demeanor was described by the chief executive officer as that of a "big time operator" who was "always rushing around" and who, after conducting his business with the employees, would always "get out of the bank very hurriedly".
 
 
 34
 The conclusion is thus inescapable that the defendant East Side Bank was grossly negligent in handling the aforementioned Schulman transactions in the manner described. However, the bank has further questioned the propriety of the judgment of the lower court, contending that either "actual knowledge" or "bad faith", rather than "gross negligence", is the proper test of a bank's liability under such circumstances as are here presented. The bank contends that, because the terms "actual knowledge" and "bad faith" differ conceptually from the meaning of "gross negligence", the bank can here avoid liability even though having been grossly negligent.
 
 
 35
 While the problem thus posed is probably as much semantical as legal in nature, its effect is to obscure the essential fact that the defendant bank did have actual knowledge of Schulman's lack of authority to negotiate checks payable to National Lumber in the manner described during January, 1963. This is so for the reason that, during that entire period — as was well known by the bank's chief executive officer, still on file with the bank was the resolution dated December 17, 1962, under which the counter-signature of Paul was still technically required and which, in no event, authorized the president of National Lumber to engage in the transactions practiced by Schulman and condoned by the bank. Schulman never having returned the resolution form handed to him prior to January 4, 1963, the prescriptions of that earlier resolution were still in effect and an existing part of the contract between East Side Bank and National Lumber, as evidenced by the final provision thereof:
 
 
 36
 "6. * * * (T)his Resolution shall be in full force and effect and binding upon this Corporation until it shall have been rescinded, and written notice of such rescission under the corporate seal shall have been delivered to said Bank."
 
 
 37
 Therefore, when the defendant bank agreed to accept the checks payable to National Lumber and to pay over the proceeds thereof to Schulman in cash and by crediting his personal account, it did so in knowing violation of the corporate resolution then on file and, consequently, with actual notice that Schulman, as National Lumber's fiduciary, was in breach of a duty. To this extent, the bank took the checks not as a holder in due course, Uniform Commercial Code, 26 Ill.Rev.Stat. §§ 3-302(1) (c), 3-304(2) (1963), and was therefore subject to the claim of National Lumber Company, Uniform Commercial Code, 26 Ill.Rev.Stat. § 3-306(a) (1963).[7] The claim of National Lumber is, of course, that the bank, by its unauthorized violation of the express contract with its depositor, National Lumber, dealt with Schulman in such manner at its peril, and, upon the bank's gross neglect of its duty to reasonably protect the interests of National Lumber and that corporation's innocent creditors, became liable when its transactions with Schulman were thereafter exposed to have constituted a fraud upon said parties.
 
 
 38
 Yet there may be some truth to the proposition that, under the Uniform Commercial Code, which has been effective in Illinois since July 2, 1962, the defendant East Side Bank would be liable to this trustee in bankruptcy upon the sole showing that the bank acted in derogation of its actual knowledge of the extent of Schulman's authority as president of National Lumber, and that proof of gross negligence in other particulars would be superfluous. In fact, prior to the advent of the Code, it was well settled that courts would impose a high standard of contractual responsibility on depositary banks to pay checks in strict accordance with the direction of its depositors. United States Cold Storage Co. v. Central Mfg. Dist. Bank, 343 Ill. 503, 175 N.E. 825, 74 A.L.R. 811 (1931); Wagner Trading Co. v. Battery Park National Bank, 228 N.Y. 37, 126 N.E. 347, 9 A.L.R. 340 (1920); Callaway v. Hamilton National Bank of Washington, 90 U.S. App.D.C. 228, 195 F.2d 557 (1952); 10 Am.Jur.2d 462 (Banks, § 494). Thus, under that body of law, both depositors and banks are bound by the terms of an unambiguous deposit agreement, the validity of which is unquestioned, Speasl v. National Bank of Decatur, 37 Ill.App.2d 384, 186 N.E.2d 84 (1962), and a bank cannot legally pay out funds except upon the approval and signature it has been instructed is necessary, Miller v. First Granite City National Bank, 349 Ill.App. 347, 110 N.E.2d 651 (1953). That such agreements are rigidly scrutinized is testified to by the holding in Barrett v. Continental Illinois National Bank, 2 Ill.App. 2d 70, 118 N.E.2d 631 (1954), that, although bank resolutions on file govern the bank's liability, such liability is not to be governed by resolutions which might be on file or which are actually received very shortly thereafter.
 
 
 39
 Nevertheless, we cannot say that evidence of gross negligence does not have a proper place in such a lawsuit as this. For one thing, the Uniform Commercial Code may be understood to mean that such cases involve two elements of proof: first, proof that the bank knowingly engaged in transactions in violation of bank resolutions and thus with actual knowledge that its depositor was acting in excess of express authority, which proof would establish that the bank took the instruments involved subject to the claims of others as a holder without due course status pursuant to Sections 3-302(1) (c) and 3-304(2); and, secondly, in addition to lack of authority, proof of gross negligence in making the transactions, which proof would establish the validity of the claim or claims under Section 3-306(a). Furthermore, evidence of all the circumstances surrounding the transactions, which here has gone to prove gross negligence on the part of the bank, has the added merit of enabling courts and juries to focus attention upon the "equities" of the respective parties, thereby insuring that legal responsibility for the transactions will fairly and justly be placed upon the deserving party. Indeed, this defendant has appeared to argue in several instances that, inasmuch as it "was an innocent tool employed by Schulman" and thus free from any taint of actual fraud, intentional harm and bad faith, liability in the large amount involved should not be imposed upon the bank on the sheer basis of a technical reading of the contract between it and the National Lumber Company. However, evidence of all the circumstances — part of which has been reiterated at some length above, has well satisfied this Court that the decision below was based, not upon any mere technicality, but upon the obvious fact that the defendant East Side Bank committed a serious breach of its duty to its depositor, National Lumber, and to that corporation's innocent creditors. And it is upon that ground that we hereby affirm the judgment below.
 
 
 40
 The defendant bank has further attempted to avoid liability for the transactions in question on the basis of several principles of the law of agency. The bank contends that: (a) Schulman had implied authority to cash National Lumber checks; or (b) Schulman had apparent authority to cash National Lumber checks; or (c) National Lumber ratified Schulman's cashing of its checks; or, finally, (d) National Lumber, and hence plaintiff, is estopped to question Schulman's authority because of its express grant of authority, through Paul, to Schulman. However, these purported defenses must fail for the reason that the rights of the respective parties and the authority of Schulman as president of National Lumber were expressly set forth in the bank resolutions — a specific contract prepared by the defendant bank itself — which were never rescinded and which, by their terms, could not be orally amended. See, Kaplan v. First Trust and Savings Bank of Riverdale, 48 Ill.App.2d 374, 376, 199 N.E.2d 243, 244 (1964); Krantz v. Oak Park Trust and Savings Bank, 16 Ill.App.2d 331, 335, 147 N.E.2d 881, 883 (1958).
 
 
 41
 The contentions of the defendant bank questioning its liability under the Bankruptcy Act and the propriety of granting plaintiff's motion for summary judgment were adequately answered in the memorandum opinion of the district court. Maley v. East Side Bank of Chicago, 234 F.Supp. 395, 398 (N.D.Ill.1964).
 
 
 42
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Maley v. East Side Bank of Chicago, 234 F.Supp. 395 (N.D.Ill.1964)
 
 
 [2]
 "National Lumber Company", "C. M. Paul Lumber Company" and "National Lumber Company, a division of C. M. Paul Lumber Company, Inc." were at all times after incorporation one and the same entity
 
 
 [3]
 After making the initial offer to purchase National Lumber, Schulman persisted in telephoning Paul "10 or 12 times that day" in an effort to consummate the transaction the very day the offer was made. Schulman did so despite the protestations of Paul's attorney that he could not "make up the papers that fast" and the fact that, at that point, Schulman apparently had not contacted Paul at the latter's place of business but had merely "[driven] by the place and [seen] the operation." Then, later that day at the first meeting of the parties, Schulman indicated a desire that the transaction be handled on a cash basis, which desire was successfully objected to by Paul's legal counsel
 
 
 [4]
 The bank's chief executive officer testified in this regard as follows:
 "Well, of course, whenever I got a credit inquiry on these people, my standard answer was that we had done — that we had been doing business with National Lumber Company for a couple of years, and we had had loans with them and they had always been very good, that their account had been good, but that it was my understanding that there was a new man taking over, and that we knew nothing at all about the new man."
 
 
 [5]
 Schulman had been adjudicated bankrupt in 1961 in the Northern District of Illinois, but this fact did not come to the attention of the creditors or the bank until on or about January 20, 1963, when it was discovered and reported by Dun & Bradstreet
 For their part, it appears that creditors were under the impression that they were dealing with an established corporation and were not aware of Schulman's involvement. The credit inquiries usually were not productive of the name of the "new man taking over" National Lumber; one creditor stated later that he would not have extended credit to National Lumber had he known of Schulman's participation in its affairs as Schulman's bad reputation in the trade was well known to him.
 
 
 [6]
 Relevant data concerning the checks is as follows:
 Date of Payee Shown
 Cashing Amount on Check Endorsement
 1963
 _________________________________________________________________________
 Jan. 4 $9,238.67 National Lumber Co. National Lumber Co.
 M. Schulman
 For Deposit Only
 Jan. 8 5,967.85 National Lumber Co. National Lumber Co.
 M. Schulman
 Jan. 10 6,267.45 National Lumber Co. National Lumber Co.
 By M. Schulman
 Jan. 10 5,922.00 National Lumber Co. National Lumber Co.
 M. Schulman
 Jan. 12 3,461.50 National Lumber Co. National Lumber Co.
 M. Schulman
 Jan. 15 9,900.00 National Lumber Co. National Lumber Co.
 M. Schulman
 Jan. 18 3,913.12 National Lumber Co. National Lumber Co.
 By N. Schulman, Pres.
 Jan. 12 808.52 National Lumber Co. National Lumber Co.
 M. Schulman
 Jan. 15 547.87 National Lumber Co. National Lumber Co.
 M. Schulman, Pres.
 Jan. 28 100.00 National Lumber Co. National Lumber Co.
 M. Schulman
 __________
 Total $46,126.98
 
 
 [7]
 Uniform Commercial Code, 26 Ill.Rev. Stat. § 3-302(1) (c) states that "A holder in due course is a holder who takes the instrument * * * (c) without notice * * * of any defense against or claim to it on the part of any person."
 Uniform Commercial Code, 26 Ill.Rev. Stat. § 3-304(2) states: "The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty."
 Uniform Commercial Code, 26 Ill.Rev. Stat. § 3-306(a) provides: "Unless he has the rights of a holder in due course any person takes the instrument subject to (a) all valid claims to it on the part of any person * * *."