In re TACO ED'S, INC., et al., Debtor(s).

Thomas R. MICHALSKI, Plaintiff(s),

v.

STATE BANK AND TRUST, et al., Defendant(s).

Bankruptcy No. 84–0304.
Related Case: 84–00039.

United States Bankruptcy Court,
N.D. Ohio, W.D.

Aug. 13, 1986.

Ruth Meacham, Toledo, Ohio, for plaintiff.

John J. Hunter, Toledo, Ohio, for State Bank.

James Hitchcock, Defiance, Ohio, for Admin. of Estate of Joseph Barentine.

## MEMORANDUM OPINION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court upon the Motion For Summary Judgment filed by the Plaintiff in the above entitled adversary action. The parties have filed the arguments and evidence they wish the Court to consider relative to the merits of this motion, and have been afforded the opportunity to respond to the arguments made by opposing counsel. The Court has reviewed those arguments, the evidence, and the entire record in this case. Based upon that review and for the following reasons the Court finds that the Motion For Summary Judgment should be granted in part and denied in part.

## FACTS

The Plaintiff in this action is the trustee appointed by the Court subsequent to the conversion of the Debtor's Chapter 11 Petition to a proceeding under Chapter 7. The Defendant Eddie L. Bernal (hereinafter Bernal) was an officer and shareholder of the Debtor corporation. Joseph E. Baren-

tine (hereinafter Barentine) was also an officer and the remaining shareholder of the Debtor. Inasmuch as Barentine is deceased, his estate and its representative have been made defendants in this action. The State Bank & Trust Co. (hereinafter Bank) is a banking institution with which Bernal, Barentine, and the Debtor had numerous business relationships prior to the filing of the Debtor's Petition. The Debtor and its related entity, Taco Operations, Inc., were corporations engaged in the business of owning, operating, and franchising a series of Mexican-style restaurants. They were also in the business of supplying and marketing the materials associated with such restaurants.

The facts which serve as the basis for the present Motion are derived primarily from the deposition testimony of an officer of the Bank and from the Exhibits employed during the course of that deposition. These facts set forth a complex series of transactions between the Defendants which began approximately one year prior to the filing of the Debtor's Petition. It does not appear that the facts established by this evidence are in serious dispute.

Prior to February 7, 1983, it appears that the only involvement between the Bank and the other Defendants entailed the existence of a mortgage held by the Bank against Barentine's personal residence. However, on February 7, 1983, Bernal and Barentine, in their capacities as corporate officers, applied for and received a line of credit with the Bank in the name of the Debtor. It appears that the purpose of this line of credit was for the funding of the Debtor's ongoing operations. On or about this same date, Bernal and Barentine established with the Bank a "VISA" credit card account in the name of the Debtor.

On April 15, 1983, Barentine opened a checking account with the Bank, account number 041–704 (hereinafter Barentine Checking Account). This account was opened in his own name on April 18, 1983, Barentine opened a money market account with the Bank, account number 661–7635 (hereinafter Barentine Money Market Ac-

count). This account was also opened in his own name. On May 9, 1983, Barentine, on behalf of the Debtor, opened a money market account with the Bank, account number 690–1091 (hereinafter Debtor Money Market Account). The evidence reflects that this account was opened in the name of and belonged to the Debtor.

On May 19, 1983, Taco Operations, Inc., applied for and received a Fifty Thousand and no/100 Dollars ($50,000.00) loan from the Bank. In return for this loan, Taco Operations, Inc. gave the Bank a promissory note and a security interest in several parcels of real estate. Although the record in unclear as to the owners of these parcels, the documents appear to reflect that they were owned by Taco Operations, Inc. There is, however, some indication that these parcels included the personal residence of Bernal. The mortgage securing this loan to Taco Operations, Inc. was recorded on May 25, 1983.

On June 28, 1983, a check was executed by Fugate Enterprises in the amount of One Hundred Fifty Thousand and no/100 Dollars ($150,000.00) (hereinafter Fugate check). This check was made payable to Bernal and Barentine, individually, and bore no reference to the Debtor. It does not appear that Fugate Enterprises is affiliated or associated with Bernal, Barentine, or the Bank. On June 29, 1983, the Fugate check was negotiated by Bernal and Barentine at the Bank. Subsequent to this negotiation, One Hundred Thousand and no/100 Dollars ($100,000.00) was deposited in the Debtor's Money Market Account. The remaining Fifty Thousand and no/100 Dollars ($50,000.00) was used as a downpayment on the purchase of a parcel of real estate (hereinafter Schafer Property) which was being bought by the Debtor from John L. and Sarah E. Schafer. On August 1, 1983, Barentine applied for and received an additional Thirty Thousand and no/100 Dollar ($30,000.00) loan from the Bank, account number 72498 (hereinafter Barentine Real Estate Loan). The documents representing this obligation reflect that Barentine was individually liable on this debt.

The proceeds of the Barentine Real Estate Loan were used to purchase a cashier's check from the Bank which, in turn, was tendered as the balance of the purchase price on the Schafer Property. In return for the Barentine Real Estate Loan, Barentine, in his capacity as an officer of the Debtor, executed a mortgage of the Schafer Property in favor of the Bank. On August 9, 1983, a deed was executed by the Schafers transferring the Schafer Property to the Debtor. Although the deed was recorded on August 10, 1983, the mortgage was not recorded at this time.

On August 8, 1983, a check was executed by one Barbara Gray in the amount of Ten Thousand and no/100 Dollars ($10,000.00) (hereinafter Gray Check # 1). Only the Debtor was named as payee on this instrument. On August 11, 1983, this check was indorsed by Bernal and Barentine in their corporate capacity and deposited into the Barentine Money Market Account. On September 2, 1983, a second check was executed by Barbara Gray in the amount of Ten Thousand and no/100 Dollars ($10,-000.00) (hereinafter Gray Check # 2). This check was also made payable solely to the Debtor. As with Gray Check # 1, Gray Check # 2 was indorsed by Bernal and Barentine in their corporate capacities and deposited in the Barentine Money Market Account.

On September 19, 1983, Bernal and Barentine passed a corporate resolution, whereby the Debtor was authorized to seek further extensions of credit from the Bank. On September 20, 1983, pursuant to this apparent grant of authority, Barentine applied for and received a loan in the amount of Thirty Thousand and no/100 Dollars ($30,000.00) (hereinafter Barentine Company Loan). In return for this loan, Barentine executed a promissory note in favor of the Bank. Inasmuch as the loan documents make no reference to the Debtor, it appears that Barentine incurred this debt in his individual capacity. However, in addition to his execution of the promissory note, Barentine pledged to the Bank as security for this loan approximately 532 shares of Toledo Trustcorp stock (herein-

after Toledo Trust Securities) which were owned by the Debtor. It also appears that Barentine pledged as additional security for this loan approximately 132 shares of Toledo Trustcorp stock which he individually owned. The proceeds of the Barentine Company Loan were ultimately used to pay certain entities which appear to have been creditors of the Debtor. It further appears that at the time this loan was made, the Bank's officers were aware of the fact that the loan was sought for the purpose of paying corporate "bills".

On September 21, 1983, a check was executed by the Enterprise Investment Club in the amount of One Thousand Eight Hundred and no/100 Dollars ($1,800.00) (hereinafter Enterprise Investment Check). This check was made payable to Bernal and Barentine without reference to their corporate capacities. However, this instrument bore a notation that it was for "1⅓ Notes". On September 22, 1983, a check was executed by one Bradley Smith in the amount of Nineteen Thousand Nine Hundred Fifty and no/100 Dollars ($19,950.00) (hereinafter Smith Check). This check was also made payable directly to Bernal and Barentine. Both the Enterprise Investment Check and the Smith Check were indorsed by Bernal and Barentine on September 23, 1983, and were deposited in the Barentine Money Market Account. Neither the Enterprise Investment Club nor Bradley Smith appear to have an affiliation with any of the Defendants.

On October 5, 1983, one Earl Unkefer executed a check in the amount of Four Thousand and no/100 Dollars ($4,000.00) (hereinafter Unkefer Check). This instrument was made payable to Bernal and Barentine. The check bore the notation that it was for "2 sh. Taco Ed". The Unkefer Check was indorsed by Bernal and Barentine and deposited in the Barentine Money Market Account on October 12, 1983. Unkefer also appears to be unrelated to the Defendants.

On November 7, 1983, Barentine opened a checking account with the Bank in the

name of the Debtor, account number 898–996 (hereinafter Debtor Checking Account). The source of the funds used to open this account is unclear. On November 8, 1983, a check was executed by a person whose name cannot be positively identified from the exhibit. However, it does not appear to have been an entity which is associated with the Defendants. This check is in the amount of Seven Thousand Five Hundred and no/100 Dollars ($7,500.00) (hereinafter Unknown Check) and is made payable to the Debtor. It was indorsed by Bernal and Barentine in their corporate capacities. Although the specific disposition of this check is not made clear, it appears to have been deposited in the Barentine Money Market Account.

On November 10, 1983, a check from one John Kuhn was executed in the amount of Fifty Thousand and no/100 Dollars ($50,000.00) (hereinafter Kuhn Check), and was made payable directly to Bernal and Barentine. They indorsed the check and negotiated it at the Bank on the same day it was executed. It appears that Thirty-two Thousand Forty-seven and 16/100 Dollars ($32,047.16) of the proceeds were deposited into the Barentine Money Market Account. The disposition of the remainder is not clear. On November 15, 1983, a check was executed by one Robert Lunger in the amount of Seven Thousand and no/100 Dollars ($7,000.00) (hereinafter Lunger Check). This instrument was also made payable to Bernal and Barentine and was negotiated by them at the Bank on November 16, 1983. It appears that Five Thousand Five Hundred and no/100 Dollars ($5,500.00) of this check were deposited in the Barentine Checking Account. The disposition of the balance is not clear. Both Kuhn and Lunger appear to be unrelated to any of the Defendants.

On December 20, 1983, the Debtor received at its headquarters in Defiance, Ohio, a cashier's check drawn on the Ben Franklin Savings of Houston, Texas (hereinafter Plonski Check). This instrument was in the amount of Forty-five Thousand and no/100 Dollars ($45,000.00) and was made payable to Bernal and Barentine.

There is a notation on the instrument that it was remitted by one Jerry Plonski. Although the record is unclear, it appears that Plonski may have some association with the Debtor.

The record indicates that on or about December 22, 1983, the Bank became concerned with the delinquent status of several of the outstanding obligations to Barentine and the Debtor. At a meeting with the officers of the Bank, Barentine negotiated certain terms regarding the payment of several of these obligations. As a result of these negotiations, Barentine agreed that the Plonski check would be applied to two of the debts. After Bernal and Barentine indorsed the Plonski Check, the proceeds were used to purchase a cashier's check in the amount of Forty Thousand Four Hundred Twenty-five and 89/100 Dollars ($40,425.89). This cashier's check was tendered to the Bank as payment-in-full of the Barentine Company Loan, both principal and interest, in the amount of Thirty Thousand Two Hundred Fifteen and 76/100 Dollars ($30,215.76). The cashier's check was also used to pay on the Barentine Real Estate Loan the accrued interest of Two Hundred Ten and 13/100 Dollars ($210.13) and Ten Thousand and no/100 Dollars ($10,000.00) of principal. The remainder of the Plonski check was deposited in the Debtor Checking Account.

As a result of these payments, there remained on the Barentine Real Estate Loan a principal balance of Twenty Thousand and no/100 Dollars ($20,000.00). In addition to the foregoing payments, the Bank required Barentine to renew the Barentine Real Estate Loan (hereinafter Barentine Renewal Loan). The Bank also required him to pledge as security for this renewal both the Toledo Trust Securities and his own shares of Toledo Trustcorp stock which had previously secured the Brentine Company Loan. Furthermore, the Bank caused to be recorded the mortgage on the Schafer property. It should be recalled that this mortgage was executed on August 1, 1983, in connection with the

Barentine Real Estate Loan. The mortgage was recorded on December 28, 1983.

As the result of an investigation by the Securities and Exchange Commission, that agency filed a Complaint against the Debtor in the United States District Court for the Northern District of Ohio, Western Division on December 22, 1983. In that Complaint, the Securities and Exchange Commission alleged that the Debtor was in violation of federal statutes relating to the sale of securities. In conjunction with that Complaint, the agency sought and received an injunction, whereby all entities in possession of assets belonging to the Debtor, Bernal, or Barentine were enjoined from disposing of those assets. It appears that the Bank was served with notice of that injunction. However, it is unclear whether or not the Bank learned of the injunction prior or subsequent to its negotiations with Barentine. As of December 31, 1983, there remained approximately Seven Thousand Two Hundred Twenty-one and 96/100 Dollars ($7,221.96) in the Debtor Checking Account and Six Hundred Sixteen and 21/100 Dollars ($616.21) in the Debtor Money Market Account.

Pursuant to an agreement with the Securities and Exchange Commission, the Debtor and Taco Operations, Inc. filed their voluntary Chapter 11 Petitions with this Court on January 9, 1984. It appears that on that same date, the Bank exercised a setoff of the funds in the Debtor Checking Account against the debt owed by the Debtor on its "VISA" account. The amount of this setoff was Three Thousand Two Hundred Twenty-eight and 79/100 Dollars ($3,228.79). It is unclear whether or not this setoff occurred prior or subsequent to the filing of the Petition. Shortly after the filing of the Petitions, a Trustee was appointed by this Court to operate the Debtor's business.

On February 22, 1984, the Bank exercised a further setoff of funds in the Debtor Checking Account. The debt against which this setoff was applied is unclear. The Bank also exercised a setoff of the funds in the Debtor Money Market Account. On March 15, 1984, the Bank sold the Toledo Trust Securities to an undisclosed party for Twenty Thousand Six Hundred Ninety-seven and 04/100 Dollars ($20,697.04). The proceeds of this sale were applied to the Barentine Renewal Loan. Although the Bank, at the request of the Trustee, returned to the Debtor's bankruptcy estate the funds consumed in the February 22, 1983, setoff, no other funds have been turned over to the estate. On May 1, 1984, both Chapter 11 cases were converted to proceedings under Chapter 7. At that time the Plaintiff in this action was appointed as Trustee.

As a result of the foregoing transactions, the Trustee filed the adversary action which is presently before the Court. In the Amended Complaint, the Trustee has asserted eight "causes of action" which, for purposes of clarity, will hereinafter be referred to as Counts. A review of those Counts finds that there are alleged several causes of action against the Bank, Bernal, and Barentine, or a combination thereof. Specifically, Count One asserts an action against the Bank to recover a preferential transfer under the provisions of 11 U.S.C. § 547 based upon the December 22, 1983, payment of the Barentine Company Loan and the Barentine Real Estate Loan. The second Count asserts an action under the same section to avoid the taking of a security interest in the Toledo Trust Securities and the perfection of the mortgage on the Schafter Property, both of which also occurred on December 22, 1983. The third Count asserts several causes of action against the Bank. Initially, the third Count asserts an action to avoid the postpetition transfer of the Toledo Trust Securities under the provisions of 11 U.S.C. § 549. Secondly, it seeks a turnover of the Toledo Trust Securities under the provisions of 11 U.S.C. § 542. Finally, Count Three asserts an action for contempt based upon the imposition of the District Court injunction, the automatic stay, and the Bank's sale of the Toledo Trust Securities.

Count Four contains several causes of action against Bernal and Barentine, and

two causes of action against the Bank. These causes all arise from the fashion in which the aforementioned checks were negotiated by both the Bank and the Debtor's officers. As will be more fully developed in this Opinion, the Trustee contends that Bernal and Barentine were engaged in a course of conduct, whereby they would solicit from private individuals and groups "investments" in the Debtor. Once an investor had agreed to make an investment, the investor would issue a check in return for a promissory note. The check would be made payable to either the Debtor or to Bernal and Barentine. At the time these transactions were negotiated, it was represented to the investors by Bernal and Barentine that the promissory notes would be converted to shares of stock in the Debtor at such time as the Debtor "went public". Based upon this conduct and their solicitation of investments the Trustee alleges that regardless of whether the checks were payable to the Debtor or to Bernal and Barentine, the checks and their proceeds were property of the Debtor. He further alleges that Bernal's and Barentine's diversion of these checks into Barentine's personal account gives rise to several causes of action for conversion.

As against the Bank, the Trustee alleges in Count Four that the Bank's negotiation of these checks was an unlawful conversion of the Debtor's property. As against Bernal and Barentine, Count Four alleges that the diversion of these checks into Barentine's personal account also constitutes an unlawful conversion. However, in conjunction with this cause, the Trustee asserts an action for the imposition of a constructive trust over the funds which remain in the personal accounts of both Bernal and Barentine. Count Four also asserts an action against Bernal and Barentine for breach of their fiduciary duty to the Debtor. There is further asserted in Count Four an action under the provisions of Ohio Revised Code § 1701.95 to hold Bernal and Barentine liable for the unlawful distribution of corporate assets. Finally, Count Four seeks to avoid the transfer of checks

as fraudulent conveyances under the provisions of 11 U.S.C. § 548.

Count Five asserts an action against the Bank under the provisions of Ohio Revised Code § 1303.55 based upon the Bank's presentation of the Debtor's checks to the drawee banks. Count Six asserts an action under the same statute based upon the Bank's alleged use of the Debtor's checks for its own purposes. Count Seven alleges an action against the Bank for money "had and received". Finally, Count Eight asserts two actions against the Bank, the first of which seeks to avoid under the provisions of 11 U.S.C. § 547 the post-petition setoff of the amounts owed on the Debtor's VISA account. Secondly, it asserts an action to avoid the same setoff under the provisions of 11 U.S.C. § 549.

Bernal has not filed an answer or otherwise made any appearance in this action. The Answer filed by the estate of Barentine substantially denies the allegations set forth in the Amended Complaint. The Answer also asserts a Cross-Claim against the Bank to recover the shares of Toledo Trustcorp which belong to Barentine and which appear to be in the Bank's possession. In addition, Barentine's Answer asserts a Counterclaim against the Trustee, wherein the representative of his estate seeks to recover any assets belonging to Barentine which are in the Trustee's possession.

The Bank's Answer to the Amended Complaint also substantially denies the allegations set forth. In conjunction with that Answer, the Bank asserts a Counterclaim against the Trustee, wherein it seeks to recover the monies returned to the Debtor's estate which had been previously setoff from the Debtor Checking Account and the Debtor Money Market Account.

The Motion presently before the Court appears to seek a summary adjudication of the causes of action set forth in Counts One, Two, Three, and Four of the Amended Complaint. The uncertainty as to the relief sought by this Motion results from certain discrepancies between the prayers stated in the Motion and those found in the Amended Complaint. Despite these apparent in-

consistencies, the Court will review each action asserted in Counts One through Four.

In support of the Motion For Summary Judgment, the Plaintiff has offered the deposition of an officer of the Bank who personally conducted many of the transactions in question. As previously indicted, that testimony and the exhibits attached thereto serve as the basis for a majority of the facts relied upon by the Trustee in arguing this Motion. However, the Trustee has also offered the affidavit of one Suzanne Weber, a legal assistant employed by the operating Chapter 11 Trustee. In that affidavit, she avers that she attended to the daily operation of the Debtor during the pendency of the Chapter 11 proceeding, and that she investigated the records which were found at the Debtor's headquarters. As a result of her investigation, she was able to determine that at the time the petitions were filed, the Debtor had approximately Thirteen Million Five Hundred Eighty-seven Thousand and no/100 Dollars ($13,587,000.00) in liabilities and approximately Three Million Four Hundred Eleven Thousand Five Hundred Eighty-nine and no/100 Dollars ($3,411,589.00) in assets. The Affiant also testifies that the course of conduct engaged in by the Debtor, Bernal, and Barentine involved the sale of promissory notes to persons solicited by Bernal and Barentine to invest in the Debtor. It appears that part of this solicitation involved a "promise" that the promissory notes offered in exchange for the investment would be converted into shares of stock in the Debtor at such time as the corporation "went public". The Affiant further indicates that the promissory notes were either issued by Bernal and Barentine, to be guaranteed by the Debtor, or were issued by the Debtor, to be guaranteed by Bernal and Barentine. It should be noted that the Trustee and the Affiant have not offered any copies of these notes.

In addition to the foregoing testimony, the Affiant indicates that the Debtor's records reflect the preparation of a document entitled "Daily Cash Receipt Report". This document appears to record the daily receipt of funds by the Debtor from sources other than the operation of its restaurants. Attached to these reports were copies of the checks received from each of the investors. Also attached to these reports were the deposit slips which purport to represent the disposition of these checks. It should be noted that the account into which a majority of these checks were deposited is at the Maumee Valley National Bank, an institution which is otherwise unrelated to these proceedings. It should also be noted that the owner and authorized drawee of this account is not made clear from the record. The Affiant has attached to her Affidavit samples of the Daily Cash Receipt Reports, along with the copies of the checks and deposit slips which accompany each report. A review of those instruments finds that they were executed by numerous parties who appear to be unrelated to the Defendants. It also finds that the checks were made payable to either the Debtor or to Bernal and Barentine. Many of the instruments bear notations as to "shares" or "units" of the Debtor.

Based upon the deposition testimony, the deposition exhibits, the affidavit, and the affidavit exhibits, the Trustee has moved for summary judgment in this case. In moving for summary judgment, the Trustee attempts to establish a fundamental position which is relied upon in asserting many of his causes of action. That position involves the contention that the affairs of Bernal and Barentine were so significantly intertwined with those of the Debtor that any autonomy between those affairs is indistinguishable. The Trustee contends that this Court should disregard any legal distinction between the rights and liabilities of the respective parties, inasmuch as Bernal and Barentine used their individual identities as a conduit of and disguise for the Debtor's financial affairs.

Relying on this position, the Trustee argues that the December 22, 1983, payments on the Barentine Real Estate Loan and the Barentine Company Loan were preferential transfers which are avoidable under 11

U.S.C. § 547(b). Similarly, he argues that the taking of a security interest in the Toledo Trust Securities and the perfection of the mortgage on the Schafer Property were also avoidable preferential transfers. In addition, the Trustee argues that the evidence establishes facts which are sufficient to find Bernal's and Barentine's diversion of checks into Barentine's personal account a conversion of the Debtor's property. The Trustee further asserts that the Bank should be held in contempt of the automatic stay as a result of its admitted post-petition sale of the Toledo Trust Securities.

In opposing the Motion For Summary Judgment, the Bank has argued that in light of the numerous obligations and accounts which existed during the period in question, the affairs of Bernal and Barentine cannot, based upon the evidence before the Court, summarily be regarded as those of the Debtors. However, in addition to its opposition of the Trustee's basic premise, the Bank contends that the taking of the security interest, the perfection of the mortgage, and the payments on the Barentine Real Estate Loan were transfers made contemporaneously with the creation of the Barentine Renewal Loan. Accordingly, it is argued that these transactions are not avoidable under 11 U.S.C. § 547(b), since such contemporaneous transactions are excepted from those which are otherwise avoidable under that section. The Bank also argues that the renewal constitutes an extension of new value, an event which precludes the existence of an antecedent debt. As to the action for violation of the stay, the Bank argues that its disposition of the Toledo Trust Securities was accomplished in good faith, thereby foreclosing any finding of compensable contempt. The Bank also argues that the proceeds realized from its sale of the stocks were of "inconsequential value" to the estate in light of the total amounts owed by the Debtor. With regard to the conversion actions, the Bank argues that it conducted the transactions with Bernal, Barentine, and the Debtor in good faith and in accordance with commercially reasonable standards. Specifically, it argues that the checks were honored and credited in a manner consistent with the indorsements appearing on each of the instruments in question. In addition, it is argued that it cannot be held accountable in a conversion action, inasmuch as it has not retained any of the proceeds from those checks.

The estate of Barentine has opposed the Motion For Summary Judgment, apparently arguing that the estate of a decedent cannot be a debtor under Title 11 of the United States Code. The estate also asserts that any claims made by the Trustee in this case have been submitted subsequent to the time specified under state law for asserting claims against a decedent's estate. As previously indicated, Bernal has not, at any time or any capacity, appeared or answered in this case.

## LAW

Federal Rule of Civil Procedure, as made applicable by Bankruptcy Rule 7056, states in pertinent part:

(a) ... A party seeking to recover upon a claim, counterclaim, or crossclaim ... may ... move ... for a summary judgment in his favor upon all or any part thereof ...

(c) ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Under this Rule, a Court may grant summary judgment if it can be demonstrated that there are, with respect to any cause of action, no questions of material fact and that the parties are entitled to judgment as a matter of law. *See, Hartwig Poultry, Inc. v. C.W. Services (In re Hartwig Poultry, Inc.)*, 57 B.R. 549 (Bkcy.N.D.Ohio 1986). However, in order to prevail in an action a plaintiff must be able to demonstrate all elements of the action. *See,*

*Chalmers v. Benson (In re Benson)*, 33 B.R. 572 (Bkcy.N.D.Ohio 1983).

**I**

With regard to the causes of action set forth in Counts One and Two of the Amended Complaint, wherein the Trustee seeks to avoid 1) the payments on the Barentine Company Loan and the Barentine Real Estate Loan, 2) the taking of the security interest in the Toledo Trust Securities, and 3) the perfection of the mortgage on the Schafer property, the provisions of 11 U.S.C. § 547(b) state in pertinent part:

(b) ... the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of the creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) within 90 days before the date of the filing of the petition;

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by provisions of this title.

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

Under these provisions the Trustee may avoid the transfer of an interest of the Debtor in property which was made to a creditor on account of an antecedent debt within ninety (90) days prior to the filing of the petition if the transfer was made while the debtor was insolvent and if the transfer enabled the creditor to receive more than he would have received under Chapter 7 had the transfer not been made. *Hartwig Poultry, Inc. v. C.W. Services*, supra. However, the Trustee may not avoid a transfer which was intended by the parties and which was, in fact, a contemporaneous exchange for a new value. *Hartwig Poultry, Inc. v. C.W. Services (In re Hartwig Poultry)*, 56 B.R. 326 (Bkcy.N.D.Ohio 1985).

It is well established that the creation of a security interest in property of a debtor, *Margraff v. Gruber Bottling Works, Inc. (In re Gruber Bottling Works, Inc.)*, 16 B.R. 348 (Bkcy.E.D.Pa.1982), or the perfection of a security interest against property of a debtor, *Markie v. Phillips (In re Phillips)*, 24 B.R. 712 (Bkcy.E.D. Cal.1982), are transfers of property which may be avoided under 11 U.S.C. § 547(b). However, the interest in property which is transferred must involve property which would, in the absence of the transfer, have been included in the debtor's estate. *Brown v. First National Bank of Little Rock, Arkansas*, 748 F.2d 490 (8th Cir. 1984). Where an obligation of the debtor is satisfied with property of a third party, or where the obligation which is satisfied is not owed by the debtor, there is no transfer which is subject to recovery under 11 U.S.C. § 547(b).

**A**

Turning first to the payments of the Barentine Company Loan and the Barentine Real Estate Loan which were made on or about December 22, 1983, a review of the facts finds that there was a transfer of property to the Bank on account of those obligations, and that these transfers occured within ninety days prior to the filing of the Debtor's petition. The facts also indicate that the obligations to which the transfers were applied were created several months prior to the time of the transfers. A review of the Debtor's petition indicates that the Debtor has approximately Ten Million Eight Hundred Thousand

and no/100 Dollars ($10,800,000.00) in unsecured debt, Eight Hundred Thousand and no/100 Dollars ($800,000.00) of which are priority obligations. There are also approximately One Million Eight Hundred Thousand and no/100 Dollars ($1,800,000.00) of secured claims listed in the petition (although the affidavit indicates approximately Thirteen Million Six Hundred Thousand and no/100 Dollars ($13,600,000.00) in unsecured liabilities, the Court, for purposes of this Motion, accepts the figures in the schedules). After accommodating both secured and priority creditors, it appears that general unsecured creditors will receive less than eight percent of their outstanding obligations. It should be noted that this figure does not take into consideration any allowance for administrative expenses which have or will accrue in this case. In addition, in the absence of evidence to the contrary, the Debtor is presumed to have been involvent during the ninety (90) days preceeding the filing of the petition. *See*, 11 U.S.C. § 547(f).

Based upon these facts, it must be concluded that the payments on the Barentine Company Loan and Barentine Real Estate Loan were transfers of property to a creditor on account of an antecedent debt which occured within ninety days prior to the filing of the Debtor's petition. Each of the payments enabled the Bank to receive valuable consideration on a debt which was owed to it. In addition, it appears that the Bank received, as a result of these transfers, more than it would have received from the Debtor's estate in a distribution under Chapter 7. The Barentine Company Loan was fully satisfied, and the Barentine Real Estate Loan was reduced by approximately thirty-three percent (33%), plus accrued interest. In light of the presumption of insolvency, it would appear that there are no questions of material fact as to the existence of any of the elements set forth in 11 U.S.C. § 547(b).

However, despite the apparent effect of the foregoing evidence, there remains to be shown two of the elements set forth in 11 U.S.C. § 547(b). Those elements involve the issue of whether or not the obligations in question were obligations owed by the Debtor, and whether the property transferred on account of those obligations was the Debtor's property. In that regard, a review of the facts finds that the Barentine Company Loan and the Barentine Real Estate Loan were obligations on which Barentine, in his individual capacity, was liable. There does not appear to be any terms or conditions within those documents which bind the Debtor to those obligations. Furthermore, the Plonski check, the source of funds from which the transfers were made, was payable to Bernal and Barentine individually and was indorsed by them without reference to their corporate office. There is nothing to reflect that the Debtor was entitled to exercise any dominion over the instrument. Without indicia as to the Debtor's liability on either the Barentine Real Estate Loan or the Barentine Company Loan, there remains a question as to whether or not the debt was one owed by the Debtor. Similarly, in the absence of evidence to show that the Debtor was entitled to the proceeds of the Plonski Check, there is a question as to whether there was a transfer of the Debtor's property. The existence of these questions requires the Court to conclude that summary judgment cannot be granted as to Count One of the Amended Complaint.

The Trustee has argued that the transactions of Bernal and Barentine were sufficiently intertwined with those of the Debtor so as to effectively render the affairs of one the affairs of the other. Ostensibly, the Trustee petitions the Court to disregard, as a matter of equity, any legal distinction between the individual and corporate entities. If this Court were to ignore the capacities of the particular entities, it would have the effect of merging Barentine's individual obligations and assets with those incurred or acquired under the guise of his authority as an officer of the Debtor. In effect, the Barentine Company Loan and the Barentine Real Estate Loan would become obligations of the Debtor. Similarly, the proceeds of the Plonski Check would become assets of the

Debtor. This merger would result in the satisfaction of the remaining elements of 11 U.S.C. § 547(b) which, heretofore, have not been shown.

Although it appears that the Trustee's argument as to the relationship between Bernal, Barentine, and the Debtor bears some merit, the evidence presently before the Court is insufficient, for purposes of summary judgment, to warrant such a finding. Specifically, with the exception of the transactions set forth in the deposition, there has been no showing as to the continuing nature or extent of this alleged relationship. The Trustee has not demonstrated what percentage of the parties' transactions are represented by those in question in this case. There has also been no attempt to show the purposes to which Barentine used the funds deposited in his personal accounts. Furthermore, there has been no indication as to whether or not the drafters of the instruments actually intended the proceeds to be used for corporate purposes, or whether the named payees were the intended recipients. In addition, the Trustee has not offered any evidence which discloses the owner of the account at the Maumee Valley National Bank or the disposition of funds from that account. At the present time, the only evidence before the Court shows that Bernal and Barentine received numerous checks which bore some notation as to the Debtor, and that Bernal and Barentine negotiated into Barentine's individual account checks which were otherwise payable to themselves individually. Without evidence which establishes to a greater degree of certainty the interlocking relationship between the affairs of the Debtor and those of Bernal and Barentine, this Court cannot conclude that the Trustee's theory will support the elements of any cause of action which rely on this argument in the present summary judgment motion.

**B**

With regard to Count Two of the Amended Complaint, wherein the Trustee alleges the avoidability of the security interest in the Toledo Trust Securities and the perfection of the mortgage on the Schafer Property, it appears that the elements established as to Count One are also present in Count Two. Specifically, the perfection of the mortgage and the taking of the security interest were transfers of an interest in property to a creditor on account of a pre-existing debt which were made within ninety days prior to the filing of the petition. The deposition testimony makes clear the fact that the interests were transferred to secure the renewal of the Barentine Real Estate Loan (Barentine Renewal Loan), a debt which pre-existed the transfer. The transfers of those interests enabled the Bank to rely on specific property for recovery of the debt. This ability would yield to the Bank a greater percentage of the outstanding obligation than it otherwise would have received as an unsecured creditor. As previously indicated, the Debtor is presumed to have been insolvent during the ninety day period prior to filing. In light of these facts, it must be concluded that there are no questions of material fact as to the existence of the respective elements addressed by these facts.

■ Despite the certainty as to the foregoing elements, the cause of action alleged under Count Two suffers from the same deficiencies found in Count One. Specifically, it does not appear that the debts in question were owed by the Debtor. A review of the documents which represent the Barentine Real Estate Loan and the Barentine Renewal Loan finds that there are no provisions in those contracts which render the Debtor liable on those debts. Rather, it appears that Barentine, in his individual capacity, is the sole obligor. However, the Schafer Property and the Toledo Trust Securities are assets which belong solely to the Debtor. As has been previously indicated, the transfer of property of the debtor on account of another's debt is not a transfer which is avoidable under 11 U.S.C. § 547(b). Although the Trustee has relied on his assertion that the Court should disregard the legal autonomies of Bernal, Barentine, and the Debtor, the insufficiency of

evidence to support that contention leaves unresolved a question of material fact as to certain elements of this action. The existence of that question precludes the availability of summary adjudication as to Count Two.

## II

The Court now turns to the causes of action set forth in Count Three of the Trustee's Amended Complaint. In that Count the Trustee alleges that the Bank's sale of the Toledo Trust Securities is a voidable post-petition transfer, and that he is entitled to a turnover of either the securities or the proceeds therefrom. He also alleges in this Count that the Bank should be held in contempt of the automatic stay as a result of its post-petition sale of the securities.

In reviewing the allegations set forth in this Count, it is unclear whether the Trustee is proceeding under 11 U.S.C. § 542, 11 U.S.C. § 549, or both. A review of those provisions finds that each gives rise to an independent cause of action. It also finds that the elements of those actions and the transactions avoidable thereunder are substantially dissimilar. Therefore, it does not appear that the Court will be able to effectively consider a disposition of the allegations found in Count Three unless it regards the allegations as asserting distinct causes of action. Accordingly, the Court will review the facts of this case and determine what, if any, recovery is available under either statute. The Court will also consider the request for a finding of contempt.

## A

■ With regard to a recovery of the Toledo Trust Securities as a post-petition transfer, the provisions of 11 U.S.C. § 549 state in pertinent part:

(a) ... the trustee may avoid a transfer of property of the estate—
(1) that occurs after the commencement of the case; and ...
(2)(B) that is not authorized under this title or by the Court.

Under this section, a trustee may avoid any transfer of property of the estate which was made subsequent to the filing of the petition and which was not approved by the Court. *LHG Resources, Inc. v. First National Bank of Midland (In re LHG Resources, Inc.)*, 34 B.R. 202 (Bkcy.W.D.Tex. 1983).

The deposition testimony indicates that the Bank admits to having possession of the Toledo Trust Securities subsequent to the filing of the Debtor's petition. It also indicates that the Bank admits to disposing of the securities through a sale to an undisclosed party. A review of the record in the underlying case reveals no order which authorizes the Bank's sale of those securities. Therefore, it would appear that the Bank's sale amounts to a voidable post-petition transfer.

■ However, an analysis of 11 U.S.C. § 549 finds that it authorizes the avoidance of a post-petition transfer of property from the debtor to a transferee, or from a transferee to a subsequent transferee. The facts in this case reflect that the transfer addressed by the Amended Complaint is the transfer between the Bank and an undisclosed third party. There has not been alleged any post-petition transfer of property as between the Debtor and the Bank.

■ Although the provisions of 11 U.S.C. § 549 empower a trustee to avoid post-petition transfers between the original transferee and a subsequent transferee, and to recover the property from the subsequent transferee, *see*, 11 U.S.C. § 550, the Court must have authority over the party from which recovery is sought. Such authority may be exercised pursuant to the Court's jurisdiction afforded under Title 11 against parties named as defendants in adversary proceedings. However, this Court cannot exercise jurisdiction over or order the recovery of property from parties which are not subject to the Court's jurisdiction. At the present time, no person or entity has been named as a defendant by the Trustee as a post-petition recipient of the Toledo Trust Securities. In order to

proceed under 11 U.S.C. § 549, the Trustee would have to name as a defendant the person or entity which purchased the Toledo Trust Securities from the Bank. In the absence of such a defendant, it must be concluded that the Trustee is not entitled to judgment as a matter of law as to the allegations of Count Three which rely on 11 U.S.C. § 549.

**B**

As to the Trustee's right to a turnover of the Toledo Trust Securities, the provisions of 11 U.S.C. § 542 state in pertinent part:

(a) ... an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title ... shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate ...

Under this provision, a trustee may require any entity which is in possession of property of the estate which may be used by the trustee under 11 U.S.C. § 363 to relinquish possession of that property to the trustee. This provision is applicable regardless of whether or not the entity in possession has a security interest in the property. *See, United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

As previously indicated, the Bank admits to having possession of the Toledo Trust Securities at the time the Petition was filed. The evidence indicates that these securities were being held as collateral on the Barentine Renewal Loan. However, the evidence also indicates that the securities were owned by the Debtor. There is no dispute that the Trustee may use, sell, or lease the securities under the provisions of 11 U.S.C. § 363.

Based upon these facts alone, it would appear that the Trustee is entitled to a turnover of the securities or, in light of the Bank's sale, the proceeds from the sale. However, it is well established that an enti-

ty in possession of estate property which also has a security interest in that property is entitled to receive adequate protection as a precondition to any turnover which may be required under 11 U.S.C. § 542. *See, Kanasky v. Purbeck (In re R. Purbeck & Associates, Ltd.)*, 12 B.R. 406 (Bkcy.D. Conn.1981). On the other hand, if the security interest is invalid, adequate protection is not required as a prerequisite to turnover. *Kanasky v. Purbeck*, supra.

In the present case, a review of the record finds that the Toledo Trust Securities were being held by the Bank as security for the Barentine Renewal Loan. As has been indicated, this debt is one on which Barentine alone is liable. Since there does not appear to have been any authority from the Debtor authorizing Barentine's use of its property, there is a serious question as to the validity of the Bank's security interest. As a result of this question, it would appear that the bank could be required to surrender the securities or the proceeds therefrom. However, in reflecting upon the causes of action which have previously been discussed in this Opinion, it is evident that the Trustee contends that the affairs of Bernal and Barentine were sufficiently intertwined with those of the Debtor that there was no recognizable distinction between their actions and affairs. If the Court were, for purposes of this case, to disregard the parties' legal autonomy, the question as to the validity of the Bank's security interest in the Toledo Trust Securities would become moot. In that event, and as the Trustee has conceded, the Bank would be entitled to receive adequate protection as a pre-condition to the Trustee's right to a turnover. *See, 4 Collier on Bankruptcy* 15th ed. Section 542.02.

While the Bank may ultimately be required to account for the Toledo Trust Securities or their equivalent value, it would appear that the granting of relief under 11 U.S.C. § 542 at the present time would afford the Trustee the benefit of both sides of his own argument. On one hand, the Trustee asserts that he should be entitled

to recover certain preferences regardless of the distinction between the individual identities of the entities involved. On the other hand, the Trustee asserts that he is entitled to a turnover of the Toledo Trust Securities without an offer of adequate protection, inasmuch as there is a distinction between the owner of the securities and the person liable on the underlying debt. Such a diametric interpretation of the same facts cannot serve as the foundation for two causes of action by a plaintiff against the same defendant. Unless the Trustee is willing to comply with the responsibilities attendant with his right to recover under 11 U.S.C. § 542, this Court cannot conclude that the Trustee is entitled to a turnover of the Toledo Trust Securities. Accordingly, summary judgment must be denied as to the allegations in Count Three which rely on the provisions of Section 542.

C

In addition to the actions under 11 U.S.C. § 549 and 11 U.S.C. § 542, the third Count asks this Court for a finding of contempt against the Bank for its violation of the automatic stay. It is alleged by the Trustee that such contempt arises as the result of the Bank's sale of the Toledo Trust Securities subsequent to the filing of the District Court injunction and the Debtor's Petition. The basis for this allegation is that the Bank had, at the time the securities were sold, knowledge of the injunctions proscribing the disposition of the Debtor's property. The prayer which accompanies the contempt allegations seeks compensation from the Bank for the actual damages to the estate, as well as the costs, expenses, and attorney fees incurred by the estate in its efforts to recover the securities.

In reviewing the Trustee's "cause of action", the Court notes that there is not, within either the Bankruptcy Code or the Bankruptcy Rules, a prescribed procedure by which a finding of contempt should be sought. It is unclear whether contempt for violation of 11 U.S.C. § 362(a) should be pursued by motion under Bankruptcy Rule 9014, or whether an adversary proceeding under Bankruptcy Rule 7001 is proper. Furthermore, there appears to be some question as to whether this Court has the authority to impose sanctions for civil contempt. *See, Better Homes of Virginia, Inc. v. Budget Service Co.,* 52 B.R. 426 (E.D.Va.1985), *but see, Tele-Wire Supply Corp. v. Presidential Financial Corp., Inc. (In re Industrial Tool Distributors, Inc.),* 55 B.R. 746 (N.D.Ga.1985). In the absence of procedural guidance and because the practical considerations render inconsequential the manner by which contempt proceedings are brought, this Court will entertain the "cause of action" as currently postured. In addition, for the reasons set forth in *Better Homes of Virginia, Inc. v. Budget Service Co.,* supra, the Court finds that it has the jurisdiction and authority necessary to impose civil sanctions for violations of 11 U.S.C. § 362. *See also,* 2 *Collier on Bankruptcy* 15th ed. § 362.11.

The provisions of 11 U.S.C. § 362(a) state in pertinent part:

(a) ... a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities of—

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title ...

Under this provision, a creditor is prohibited from pursuing or exercising any rights to obtain possession or dominion over property of the estate once the automatic stay has become effective. *See, Electronic Realty Associates, Inc. v. ERA Central Regional Services, Inc. (In re ERA Central Regional Services, Inc.),* 39 B.R. 738 (Bkcy.C.D.Ill.1984). This would include an exercise of dominion over property in which

a creditor has a possessory security interest. Violations of the automatic stay are subject to sanctions which may be imposed under a finding of civil contempt. *United States v. Coleman American Companies, Inc. (In re Coleman American Companies, Inc.)*, 26 B.R. 825 (Bkcy.D.Kan.1983). Such sanctions are available even if the act which constituted the violation was taken pursuant to the advice of counsel. *In re Farmers Markets, Inc.*, 36 B.R. 829 (Bkcy. E.Cal.1984). In order to prevail on a request for contempt of stay, the requesting party must be able to demonstrate that the alleged violator, though armed with knowledge or reason to know of the stay's existence, willfully acted in a fashion proscribed by the stay. *Thacker v. Etter (Matter of Thacker)*, 24 B.R. 835 (Bkcy.S.D.Ohio 1982). It should be noted that although the provisions of 11 U.S.C. § 362(h) currently address the standards and remedies available for a violation of the stay, those provisions are not applicable in this case, inasmuch as the effective date of that statute is subsequent to the filing of this case. *See*, P.L. 98–353, § 553.

A review of the deposition finds that the Bank admits it had possession of the Toledo Trust Securities, and that these securities belonged to the Debtor. The Deponant also admits that the Bank was aware of both the Debtor's pending Chapter 11 case and the injunction issued by the District Court which prohibited disposition of the Debtor's property. The deposition further indicates that in spite of its knowledge of these proceedings, the Bank sold the Toledo Trust Securities without prior Court approval.

Based upon these facts, it is apparent that the Bank had knowledge of the Debtor's case at the time the securities were sold. It is also apparent from the record that this sale was conducted without prior Court approval. Regardless of whether or not the Trustee is ultimately entitled to recover the securities, it is clear that the sale was an exercise by the Bank of dominion over the Debtor's property. *See, McGraw v. Jordan (In re Jordan)*, 47 B.R. 712 (Bkcy.N.D.Ohio 1985). Furthermore,

even though the Bank may not have acted with malevolent intent toward either the estate or the Debtor, the Bank intended to and did, in fact, dispose of property of the estate despite knowledge of the Courts' injunctions. This willful disposition violates the explicit provisions of 11 U.S.C. § 362(a)(3) and, therefore, subjects the Bank to a finding of contempt. Although the Bank has argued that it acted in good faith and upon the advice of counsel, the absence or presence of good faith does not negate the fact that an intentional disposition of estate property occurred. All that is required for a finding of contempt of stay is that the Bank had knowledge of the automatic stay, and that it disposed of the Debtor's property subsequent to acquiring its knowledge. Since the deposition testimony establishes those factors, it must be concluded that the Bank should be found in contempt of the automatic stay.

Having violated the stay, it must next be determined what sanctions, if any, should be imposed. Sanctions for contempt may be imposed for one or both of two distinct purposes. First, a Court may impose such sanctions as are necessary to compel or coerce compliance with a Court order. Secondly, a Court may require the payment of compensation to the injured party for losses resulting from the contemptuous act. *See, Tele-Wire Supply Corp., Inc. v. Presidential Financial Corp., Inc.*, supra. Compensation awards may include both actual damages sustained as a result of the violation and attorney fees incurred in seeking to rectify the violation. *See, Better Homes of Virginia, Inc. v. Budget Service Co.*, supra.

In the present case, it is apparent that the Toledo Trust Securities have been placed outside the immediate reach of either the Bank or the Trustee. As a result, there do not appear to be any sanctions available for compelling the Bank to comply with the provisions of the automatic stay. The Court cannot order the Bank to return that which it does not have. However, the Bank is able to compensate the

estate for the loss which arose from the violation. Such compensation would include a return of the value of the securities, and the payment of attorney fees incurred by the Trustee in pursuing the violation of stay. While the Court recognizes that the Bank may ultimately be entitled to retain, by virtue of its purported security interest, the proceeds from the sale of these assets, it cannot be permitted to prematurely benefit from its unilateral violation of the statutorily and judicially imposed injunctions. Accordingly, the Bank will be required to place in escrow funds which equal the value of the securities. These funds will remain in escrow until such time as it can ultimately be determined which of the parties is entitled to the benefit of the Toledo Trust Securities. In addition, the Bank will also be required to pay to the Trustee the costs and expenses he has incurred in pursuing the Bank's violation.

▆ Having determined the nature of the sanctions which are to be imposed, the Court must next address the question as to the appropriate measure of compensation. In making that assessment, the Court notes the resemblance between the Bank's unauthorized disposition of the securities and the conduct which gives rise to a cause of action for conversion. *See, McGraw v. Jordan,* supra, 18 Ohio Jur.3d *Conversion and Replevin* § 1. In an action for conversion, a plaintiff is customarily entitled to recover the value of the converted property as it was at the time and place of taking. 18 Ohio Jur.3d *Conversion and Replevin* ¶ 54. It is unclear whether or not the conversion of stock certificates, with their flexible market value and potential for dividends, has any effect on that rule.

In the present case, there has been no evidence as to whether or not the price obtained by the Bank fairly represents the market value of the Toledo Trust Securities at the time they were sold. There has also been no argument regarding the proper standard by which damages for the conversion of stock certificates should be measured, or whether the rule applicable in conversion cases is also applicable for compensation in violation of stay circumstances. Furthermore, there has been presented no evidence or argument relating to the amount of attorney fees incurred by the Trustee, and whether or not the amount of such an award is effected by the fact that the Trustee may be able to recover the value of the securities under theories of law unrelated to the contempt proceedings. Accordingly, the Court will afford the parties the opportunity to present arguments and evidence as to those issues prior to any determination of contempt sanctions.

### III

The allegations of Count Four set forth numerous causes of action against either the Bank, or against Bernal and Barentine. These actions include allegations of conversion, breach of fiduciary duty, and unlawful diversion of corporate assets. It also seeks the imposition of a constructive trust over assets being held by Bernal and Barentine. In view of the divergent theories of liability asserted against the respective Defendants and the distinct facts which give rise to these various actions, the Court will individually consider each action as it involves the Defendant against whom the action is asserted.

### A

The focus of Count Four involves allegations of conversion as against both the Bank and against Bernal and Barentine. These actions revolve around the negotiation and disposition of checks which were solicited by Bernal and Barentine on behalf of the Debtor. Although the actions set forth in the Amended Complaint appear to rely on the provisions of the Uniform Commercial Code as incorporated into the Ohio Revised Code, a reading of the Amended Complaint can also be interpreted as asserting conversion actions under common law theories of liability. Accordingly, this Court will consider both approaches to conversion liability.

A party will be liable for conversion if he wrongfully exercises control or dominion

over the property of another in denial of the rights of the rightful owner. *Wildlife Internationale, Inc. v. Clements*, 591 F.Supp. 1542 (S.D.Ohio 1984), *McGraw v. Jordan*, supra. It is not necessary that the act of conversion be accomplished with wrongful purpose of malevolent intent. *Fulks v. Fulks*, 95 Ohio App. 515, 121 N.E.2d 180 (1953). However, it is essential to the action that the Plaintiff be able to demonstrate his ownership or possessory rights in the property at the time of the alleged conversion. *Fayette Investment Corp. v. Jack Johnson Chevrolet Co.*, 119 Ohio App. 111, 197 N.E.2d 373 (1963). An action for conversion may be asserted under common law even though the property converted was a negotiable instrument. *See,* 18 Ohio Jur.3d *Conversion and Replevin* § 9. In that regard, where a bank honors a check over the forged indorsement of the payee, the bank may be held liable for conversion of the instrument regardless of whether or not it had knowledge of the forgery. *Fidelity & Deposit Co. of Maryland v. Farmers & Citizens Bank of Lancaster, Ohio,* 72 Ohio App. 432, 52 N.E.2d 549 (1943).

In addition to common law conversion, an action for conversion of a negotiable instrument may be brought pursuant to Ohio Revised Code § 1303.55, the provisions of which state in pertinent part:

(A) An instrument is converted when ...

(3) it is paid on a forged indorsement ...

(C) Subject to the provisions of section 1303.26, 1303.55, 1303.69, and 1304.11 of the Revised Code, concerning restrictive indorsements, a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

Under this statute, a negotiable instrument is converted when a depositary bank pays on an instrument over the forged indorsement of the payee. In order to prevail in an action under this section, it must be shown that the payee owns or has a right to possession of the instrument, that the indorsement over which the check was paid is forged, and that the payment of the check by the depositary bank was unauthorized. *Burks Drywall Inc. v. Washington Bank & Trust Co.,* 110 Ill.App.3d 569, 66 Ill.Dec. 222, 442 N.E.2d 648 (1982). Although it has been held that a depositary bank may escape liability if it can demonstrate that such payment was made in good faith and in accordance with reasonable commercial standards, *Denn v. First State Bank of Spring Lake Park,* 316 N.W.2d 532 (Minn.1982), it is more commonly held that a depositary bank is liable to the owner despite the provisions of the statute which preclude liability. *See, White & Summers, Uniform Commercial Code* 2nd ed. § 15–4. In that regard, it has been held that payment on an instrument which bears the unauthorized indorsement of the payee constitutes a conversion by the depositary bank, regardless of whether or not the indorsement was a forgery. *Salsman v. National Community Bank of Rutherford,* 102 N.J.Super. 482, 246 A.2d 162 (1968), *see also, Belmar Trucking Corp. v. American Trust Co.,* 65 Misc.2d 31, 316 N.Y.S.2d 247 (1970). It has also been held that an officer's indorsement of a check made payable to the corporation which is used for the officer's own purposes is a forgery, even though the officer is the sole shareholder of the corporation. *Maley v. East Side Bank of Chicago,* 361 F.2d 393 (7th Cir.1966).

A review of the Amended Complaint finds that the Trustee has not specifically set forth the checks which are alleged to have been converted by these Defendants. However, a review of the exhibits offered in conjunction with the deposition appears to reflect the instruments which are the subjects of this case. These would include Gray Check # 1, Gray Check # 2, the Enterprise Investment Check, the Smith Check, the Unkefer Check, the Unknown Check, the Kuhn Check, and the Lunger

Check. It should be recalled that these checks were negotiated by Bernal and Barentine at the Bank and were either credited to Barentine's individual account or were paid directly to Barentine.

### 1

As against the Bank, Count Four asserts causes of action arising from the Bank's negotiation of the aforementioned checks and its crediting of the proceeds to Barentine's accounts. The Trustee alleges that the Bank knew or should have known that the checks were intended by the makers to be credited to the Debtor's account, and that by negotiating the instruments in a manner inconsistent with that intention the Bank participated in an unlawful conversion of the Debtor's property.

 With regard to Gray Check # 1, Gray Check # 2, and the Unknown Check, it would appear that the Bank's negotiation of those instruments and its crediting of the proceeds to the Barentine Money Market Account constitutes a conversion under both common law and Ohio Revised Code § 1303.55. A review of each of these three checks finds that they were made specifically payable to the Debtor. In the absence of evidence to the contrary, the designation of the Debtor as payee indicates that the Debtor is the rightful owner of the instruments. By honoring those instruments and crediting the proceeds to an account other than one belonging to the Debtor, the Bank, as a transferee, participated in the wrongful exercise of dominion over the Debtor's property. Although the Bank was merely the instrumentality which set into motion the collection process, such a disposition is considered sufficient dominion over a check so as to hold the Bank liable for conversion. *See, Fidelity & Deposit Co. of Maryland v. Farmers & Citizens Bank of Lancaster, Ohio,* supra. This is made especially apparent in light of the fact that the check was made payable to the Debtor, and that the Bank, having had numerous prior dealings with the parties, deposited the proceeds into an account which had no relationship to the named payee. The difference between the named payee and the owner of the account should have been sufficient circumstances so as to create a question as to whether or not the indorsers had authority to indorse the instrument and divert its proceeds for their own purposes. The failure to question Bernal's and Barentine's authority to negotiate the instruments in the manner which occurred appears to render the Bank liable for conversion.

 Furthermore, under the provisions of Ohio Revised Code § 1303.55, it would appear that the Bank is liable for conversion of Gray Check # 1, Gray Check # 2, and the Unknown Check. As previously indicated, the designation of the payee on an instrument establishes *prima facia* evidence as to the owner of the instrument. Although Bernal and Barentine indorsed the checks in their corporate capacity, the checks were credited to Barentine's personal account. To the extent the payee was not the benefactor of the instruments, the Bank should have known that the indorsements and the dispositions of the checks were unauthorized. As a result, any payment on those checks which was made without verification of the indorser's authority would be an unauthorized payment. As indicated in *Salsman v. National Community Bank of Rutherford,* supra, the absence of proper authorization effectively renders the indorsement a forgery for purposes of Ohio Revised Code § 1303.55, even if the indorsement was made by a corporate officer on behalf of the corporate payee. *Maley v. East Side Bank of Chicago,* supra. While the Bank has asserted the good faith defense available under Section 1303.55(C), the failure to question the authority of Barentine to negotiate into his own account an instrument payable to the Debtor is conduct which deviates from standards which are acceptable as commercially reasonable. *See, Belmar Trucking Corp. v. American Trust Co.,* supra, *Pargas, Inc. v. Estate of Taylor,* 416 So.2d 1358 (La.Ct.App.1982). Therefore, since the circumstances which surround the negotiation of these checks fulfill the elements of conversion under both common

law and the provisions of Ohio Revised Code § 1303.55, it would appear that the Bank is liable to the Debtor in the amount of the aforementioned instruments.

██ With regard to the Enterprise Investment Check, the Smith Check, the Unkefer Check, the Kuhn Check and the Lunger Check, a review of those instruments finds that Bernal and Barentine are the named payees. Accordingly, they must be regarded as the rightful owners. Although several of these instruments bear some notation as to "shares" of the Debtor, those notations do not, in and of themselves, modify the indicia of ownership. Since Bernal and Barentine are the apparent owners, their indorsements would be proper for any negotiation and disposition of the checks. No further authorization would be required. Furthermore, any disposition of the proceeds would be solely within their prerogative.

In light of the apparent ownership of these instruments, it does not appear that the Debtor has any ownership or possessory rights which were violated by the Bank's negotiation. Without such an interest, the Trustee will not be able to prevail in any action based upon common law conversion liability. Similarly, an ownership interest is a requirement for any action under Ohio Revised Code § 1303.55. However, in addition to the requirement of an ownership interest, the statute requires that the indorsement over which payment was made be unauthorized. As has been previously explained, Bernal's and Barentine's indorsement does not appear to have been unauthorized, inasmuch as they are the named payees. As a result, the Trustee has failed to demonstrate two of the elements required by Section 1303.55. Since a plaintiff is required to prove all elements of an action in order to prevail, and since the evidence presently before the Court fails in that regard, it must be concluded that the Plaintiff is not entitled to summary judgment on these causes of action against the Bank.

██ It should be noted, as has been addressed earlier in this Opinion, that the Trustee has premised certain of his earlier actions on the allegation that the affairs of Bernal and Barentine were inseparable from those of the Debtor. These allegations, if proven, would have the effect of negating any distinction between the assets, liabilities, and affairs of the respective parties. If the Trustee is ultimately to prevail on his premise, then the fact that Barentine negotiated and deposited into his own account checks which otherwise belonged to the Debtor would not amount to an unlawful conversion. Inasmuch as the funds in Barentine's personal account would then be considered to be the Debtor's property, the distinction which serves as the basis for the conversion actions becomes moot. Since the Trustee cannot be permitted to rely on one interpretation of the facts for one cause of action and a diametric interpretation of those same facts for another action, the Court must reserve any adjudication of these conversion actions until such time as this issue of fact has been resolved. Once it has been determined whether or not the affairs of the three entities should be considered indistinguishable, a proper disposition of all actions set forth in Count Four against the Bank can be made.

### 2

Included in the Trustee's actions for conversion are allegations against Bernal and Barentine. Specifically, the Trustee alleges that Bernal's and Barentine's negotiation and subsequent diversion of checks which were intended for the Debtor constitutes a conversion of the Debtor's property. As with the actions alleged against the Bank, the Amended Complaint can be read as asserting actions under both common law theories of liability and Ohio Revised Code § 1303.55. However, in conjunction with the conversion actions, the Trustee asserts an action for the imposition of a constructive trust over the assets of Bernal and Barentine. It is alleged that such a trust is necessary in order to preserve the assets which were diverted from the Debtor.

■ As has been explained, the negotiation of Gray Check # 1, Gray Check # 2, and the Unknown Check appears to have been a conversion of the Debtor's property. As to the theory of common law liability, the conversion would result from the fact that the Debtor was the rightful owner of the instruments, and that Bernal's and Barentine's negotiation of those instruments into Barentine's personal account was an exercise of dominion over the Debtor's property which wrongfully denied the Debtor of its rights. Under the provisions of Section 1303.55, Bernal's and Barentine's indorsement was unauthorized, inasmuch as their authority as officers of the Debtor did not include the authority to indorse the Debtor's checks and apply the proceeds to their own purposes. Such an indorsement constitutes a forgery for purposes of Section 1303.55, and gives rise to an actionable conversion. Since Bernal and Barentine were the perpetrators of this diversion, they would appear liable to the Debtor for the amount of those instruments.

■ As to the instruments on which the individuals were named as payees, the conclusions which were reached relative to the action against the Bank also are applicable to the action against Bernal and Barentine. Since the principals were the named payees on the instruments, they must be considered as the owners. Any indorsement which was consistent with the designated payees must be regarded as an authorized indorsement. Furthermore, any disposition of a check which is properly indorsed by the named payee would be an authorized use of the check's proceeds. Since the consequences of these facts preclude the satisfaction of all elements of the action against Bernal and Barentine, summary judgment cannot be rendered against them. However, as previously discussed, the Trustee's allegations as to the inseparable affairs of the parties are inconsistent with those set forth in this cause. Therefore, for the reasons previously stated, the Court must withhold any adjudication of this action until such time as the underlying question is resolved. It should be noted that inasmuch as the action for imposition of a constructive trust is predicated on the Trustee's right to recover the converted checks, any determinations as to whether such a trust should be imposed must also be withheld.

### B

■ Another cause found within Count Four of the Amended Complaint asserts an action against Bernal and Barentine for breach of their fiduciary duty to the Debtor. In that regard, an officer of a corporation is generally considered to be an agent of that corporation. Accordingly, the officer owes a fiduciary duty to the corporation. *See generally,* 3 Ohio Jur.3d *Agency* § 101. In order to prevail in an action for breach of that duty, it must be shown that the agent acted in a fashion which was inconsistent with the interests of the agent's principal. *See generally,* 3 Ohio Jur.3d §§ 101, 106, 112.

If the Trustee is to prevail in this action, he must be able to demonstrate that the actions of Bernal and Barentine, as they relate to the negotiation and disposition of the checks in question, were substantially inconsistent with the interests of the corporations. However, if the Trustee is successful in his effort to consolidate the individual affairs of the officers with those of the Debtor, there will arise the question of whether or not the activities which were carried out in their own name were, in fact, inconsistent with those of the Debtor. Since the resolution of that question is necessarily dependent upon the disposition of the Trustee's underlying premise, any adjudication of this action should be postponed until the prior issue is concluded. Accordingly, summary judgment must be denied as to this cause of action.

### C

■ The Trustee has also asserted a cause of action against Bernal and Barentine under the provisions of Ohio Revised Code § 1701.95. That statute states in pertinent part:

(A) In addition to any other liabilities imposed by law upon directors of a corporation, directors who vote for or assent to:

(1) The payment of a dividends, or the making of a distribution of assets to shareholders, or the purchase or redemption of its own shares, contrary in any such case to law or the articles;

(3) ... shall be jointly and severally liable to the corporation as follows: in cases under division (A)(1) of this section up to the amount of such dividend, distribution, or other payment ...

Under this section, the directors of a corporation are liable to the corporation for any distribution of corporate assets which is not made in accordance with applicable law or the articles of incorporation. In the present case, it appears that the Trustee is asserting an action under this section based upon Bernal's and Barentine's diversion of checks into Barentine's personal account.

A review of this cause finds that the Trustee, in order to impose liability, will be required to show that Bernal's and Barentine's use of the checks amounts to a diversion of corporate assets. As has been discussed, it appears that the Trustee may be entitled to judgment relative to the instruments which were specifically made payable to the Debtor, but may not prevail as to those which were made payable to the individuals. However, as has also been previously explained, the availability of judgment under this section is necessarily dependent upon resolution of the Trustee's underlying premise as to the distinguishability of the parties' affairs. If it is held that the affairs of the parties should be considered identical, then it cannot necessarily be said that the directors of the Debtor wrongfully diverted corporate assets. Furthermore, there has been nothing presented to the Court which demonstrates that the funds allegedly converted by Bernal and Barentine were, in fact, not employed for corporate purposes. Therefore, in light of these questions and the uncertainty as to the Trustee's underlying theme in this case it must be concluded that sum-

mary judgment cannot be granted on this action.

**D**

The final cause of action asserted by the Trustee in Count Four is one to avoid a fraudulent conveyance under 11 U.S.C. § 548. The provisions of that statute state in pertinent part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Under this section, a trustee may avoid any transfer of property of a debtor which occurs within one year prior to the filing of the petition, and which was made either 1) with the intent to hinder, delay, or defraud creditors, or 2) which did not return to the debtor a reasonable equivalent value in exchange for the transfer. It appears that this action addresses the apparent transfer of the Debtor's checks to the personal use of Bernal and Barentine.

As has been previously explained, it appears that the Trustee may be entitled to avoid the transfers of checks which were payable specifically to the Debtor, but will not be able to avoid the transfer of those checks made payable to the individuals. Furthermore, the reasons for which this Court has postponed adjudicating those prior causes are also applicable to this cause. If the Trustee is able to show that the affairs of Bernal and Barentine were indistinguishable from those of the Debtor, then there would not, in effect, have been any transfer which could be avoided under this provision. Until the aforementioned issue has been resolved, any disposition of this action would be premature. Accordingly, summary judgment on this action must be denied.

## IV

Barentine, through the representative of his estate, has opposed the Motion For Summary Judgment on the grounds that the estate of a decedent cannot be a debtor under Title 11. It is also argued that the claims of the Trustee have been made subsequent to the expiration of the statutory time allowed for asserting claims against the decedent's estate. In addition to these contentions, a Cross-claim has been filed against the Bank to obtain possession of the shares of Toledo Trust stock which were owned by Barentine. There has also been filed a Counterclaim, wherein Barentine's estate seeks possession of all property being held by the Trustee which belonged to Barentine.

■ Initially, it must be pointed out that the action by the Trustee does not attempt to bring the estate of Barentine under the jurisdiction of Title 11 as a debtor. Rather, the Amended Complaint merely seeks to recover from Barentine certain property which is alleged to be property of the Debtor's bankruptcy estate. Although the authority for this recovery is found, in part, under Title 11, the right to recover is not made dependent upon Barentine's or his estate's eligibility to be a debtor under Title 11. Therefore, reliance on a decedent estate's ineligibility to be a debtor is misplaced.

■ As to the Counterclaim and Cross-claim, it appears that Barentine's right to recover any property held by either the Trustee or the Bank is dependent upon the ability of his estate to demonstrate that Barentine was the rightful owner of any such property. The Court has previously discussed the uncertain nature of the relationships between the Debtor, the Bank, and Barentine relative to ownership rights in property. A resolution of these disputes will have a significant impact on any determination regarding what property may be recovered by Barentine. Therefore, until such time as those underlying issues are adjudicated, the Court cannot grant summary judgment on either the Cross-claim or the Counterclaim.

## V

■ Finally, the Court turns to the Counterclaim asserted by the Bank against the Trustee. That action seeks a return of the funds paid by the Bank to the operating Trustee subsequent to the filing of the petition. Although the grounds upon which the Counterclaim is asserted are unclear, the Bank appears to allege that the funds were paid in an effort to avoid any involvement in litigation with the Trustee. As a result, it appears that this purported cause of action is founded on principles relating to accord and satisfaction. However, the basis upon which the stated relief is sought is not specifically set forth.

As is the case with the Cross-claim and Counterclaim filed by Barentine, the circumstances surrounding the relationship between the parties and the rights attendent to those relationships are in substantial question as a result of the Trustee's allegations regarding the legal autonomy of their affairs. The transaction addressed by the Bank's Counterclaim and the disposition thereof will necessarily be dependent upon a resolution of the underlying issue. Therefore, and for the reasons previously expressed, the Court will hold in abeyance

any adjudication of the Bank's Counterclaim.

## CONCLUSION

The Court has reviewed the evidence presented by the Trustee relative to those Counts of the Amended Complaint addressed in the Trustee's Motion For Summary Judgment. Although the Amended Complaint sets forth eight Counts, the relief requested by the Motion, to the extent it can be reconciled with the relief requested in the Amended Complaint, only requests summary adjudication of the first four Counts. As has become apparent throughout the Court's review of this case, the evidence presented with this Motion substantially establishes all the elements of the actions for which relief is sought. However, it is also apparent that disposition of these actions is dependent upon a resolution of the question as to whether or not the Court should disregard the legal autonomy and distinction between the affairs of Bernal and Barentine and those of the Debtor. Except as stated in this Opinion, a resolution of this question will substantially determine the rights and liabilities between the respective parties in this case. Since the evidence presently before the Court is inadequate to convince the Court as to the validity of the Trustee's fundamental premise, there remains a question of material fact which precludes summary adjudication of any action which either relies on or is inconsistent with that contention. Accordingly, the Court will conduct a trial for the purpose of hearing evidence and argument relative to the issues of 1) the legal autonomy of the affairs of Bernal and Barentine as compared to those of the Debtor, 2) the existence of the elements of the actions not established by the Motion For Summary Judgment, and 3) the existence and validity of all other causes of action, defenses, counterclaims, and cross-claims which have not otherwise been dispensed with in this Opinion.

In reaching these conclusions the Court has considered all the evidence and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

It is ORDERED that the Motion For Summary Judgment be, and is hereby, GRANTED as to the cause of action set forth in Count Three of the Amended Complaint which requests a finding of contempt.

It is FURTHER ORDERED that the Bank be, and is hereby, found in contempt of the automatic stay imposed by 11 U.S.C. § 362(a). The sanctions which shall be imposed will be determined concurrently with the Trial on the remaining merits of this case.

It is FURTHER ORDERED that the Motion for Summary Judgment be, and is hereby, DENIED as to all other Counts, Counterclaims, and Cross-claims.